J-S10036-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA    :    IN THE SUPERIOR COURT OF
   :          PENNSYLVANIA
           Appellee    :
   :
           v.    :
   :
CHRISTOPHER MICHAEL GUISEPPE    :
   :
           Appellant    :        No. 1416 EDA 2018

Appeal from the Judgment of Sentence Entered December 6, 2017
In the Court of Common Pleas of Chester County
Criminal Division at No(s): CP-15-CR-0002010-2016,
CP-15-CR-0002011-2016, CP-15-CR-0002016-2016

BEFORE:    GANTMAN, P.J.E., STABILE, J., and COLINS*, J.

MEMORANDUM BY GANTMAN, P.J.E.:          **FILED MARCH 22, 2019**

Appellant, Christopher Michael Guiseppe, appeals from the judgment of sentence entered in the Chester County Court of Common Pleas, following his open guilty plea to involuntary deviate sexual intercourse ("IDSI") with a child, indecent assault of a person less than 13 years of age, aggravated indecent assault of a child, obscene or other sexual materials—dissemination to a minor, corruption of minors, and endangering the welfare of children ("EWOC").[1] We affirm.

In its opinion, the trial court fully and correctly sets forth the relevant facts and procedural history of this case. Therefore, we have no need to

_____

[1] 18 Pa.C.S.A. §§ 3123(b), 3126(a)(7), 3125(b), 5903(c)(1), 6301(a)(1)(ii), and 4304(a)(1), respectively.

_____

\*    Retired Senior Judge assigned to the Superior Court.

restate them. Procedurally we add, Appellant entered an open guilty plea on January 19, 2017, to seven counts of indecent assault of a person less than 13 years of age, three counts each of IDSI with a child, obscene or other sexual materials—dissemination to a minor, corruption of minors, and EWOC, and one count of aggravated indecent assault of a child. The court sentenced Appellant on December 6, 2017, to an aggregate term of fifty-five (55) to one hundred ten (110) years' incarceration, plus five (5) years' probation. The court also notified Appellant of his requirement to register and report for life as a Tier III sex offender under the Sexual Offender Registration and Notification Act ("SORNA"). Subsequently, the trial court denied Appellant's post-sentence motion in an order dated March 26, 2018, and mailed to the parties on March 29, 2018.

Appellant raises one issue for our review:

WHETHER THE TRIAL COURT ERRED IN DENYING [APPELLANT]'S MOTION TO WITHDRAW HIS GUILTY PLEA PRIOR TO BEING SENTENCED[?]

(Appellant's Brief at 4).

After a thorough review of the record, the briefs of the parties, the applicable law, and the well-reasoned opinion of the Honorable Phyllis R. Streitel, we conclude Appellant's issue merits no relief. The trial court opinion comprehensively discusses and properly disposes of the question presented. (*See* Trial Court Opinion, filed June 26, 2018, at 10-24) (finding: testimony at hearing on Appellant's motion to withdraw his guilty plea established

credibly that video recording of Appellant's police interview accurately reflected his live interview with police, where DVDs containing recording of interview were neither altered nor alterable; Appellant participated in interview and knew what he had told police; further, Appellant's allegation of innocence was implausible; in police interview, Appellant confessed to crimes and gave detailed accounts of his abuse of Victims; in individual interviews with police, Victims corroborated Appellant's accounts).[2] The record supports the court's decision. Accordingly, we affirm based on the trial court opinion.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/22/19

---

[2] We depart from the trial court's analysis to the extent it appears to address portions of Appellant's challenge on the basis of ineffective assistance of counsel. Even if Appellant raised his claims of plea counsel's ineffectiveness in the trial court and the court addressed them in its opinion, Appellant did not make a knowing, intelligent, and voluntary waiver of review per the Post Conviction Relief Act ("PCRA"), at 42 Pa.C.S.A. §§ 9541-9546. Absent Appellant's waiver, we refuse to entertain his claims under the rubric of ineffective assistance of counsel on direct appeal and defer them instead for review in a timely PCRA petition. *See Commonwealth v. Holmes*, 621 Pa. 595, 598-99, 79 A.3d 562, 563-64 (2013); *Commonwealth v. Grant*, 572 Pa. 48, 813 A.2d 726 (2002) and its progeny.

COMMONWEALTH OF PENNSYLVANIA : IN THE COURT OF COMMON PLEAS

: CHESTER COUNTY, PENNSYLVANIA

vs

: CRIMINAL ACTION

CHRISTOPHER MICHAEL GUISEPPE : NOS. 2010-16; 2011-16; 2016-16

: SUPERIOR CT. NO. 1416 EDA 2018

## STATEMENT OF THE COURT

On April 26, 2018, Defendant filed a timely appeal following the court's denial of Defendant's Post Sentence Motion on March 26, 2018. An appeal having been taken, pursuant to Pa.R.A.P. 1925(a), the following statement is submitted.

Defendant was arrested following acts that occurred between January 2014 and April 2016. On docket number 2010-16, Defendant was charged with thirty-three counts of criminal conduct against victim A.H., who was ten years old at the time the criminal complaint was issued. Defendant was charged with the following: seven counts of involuntary deviate sexual intercourse, in violation of 18 Pa.C.S.A. § 3123(b); seven counts of aggravated indecent assault, in violation of 18 Pa.C.S.A. § 3125(b); seven counts of aggravated indecent assault, in violation of 18 Pa.C.S.A. § 3125(a)(7); eight counts of indecent assault, in violation of 18 Pa.C.S.A. § 3126(a)(7); corruption of minors, in violation of 18 Pa.C.S.A. § 6301(a)(1)(ii); endangering welfare of children, in violation of 18 Pa.C.S.A. § 4304(a)(1); and two counts of obscene and other sexual materials and performances, in violation of 18 Pa.C.S.A. § 5903(c)(1).

On docket number 2011-16, Defendant was charged with twelve counts of criminal conduct against victim S.G., who was nine years old at the time the criminal complaint

was issued. Defendant was charged with the following: five counts of indecent assault, in violation of 18 Pa.C.S.A. § 3126(a)(7); five counts of obscene and other sexual materials and performances, in violation of 18 Pa.C.S.A. § 5903(c)(1); corruption of minors, in violation of 18 Pa.C.S.A. § 6301(a)(1)(ii); and endangering welfare of children, in violation of 18 Pa.C.S.A. § 4304(a)(1).

On docket number 2016-16, Defendant was charged with ten counts of criminal conduct against victim B.G., who was six years old at the time the criminal complaint was issued. Defendant was charged with the following: involuntary deviate sexual intercourse, in violation of 18 Pa.C.S.A. § 3123(a)(b); two counts of aggravated indecent assault, in violation of 18 Pa.C.S.A. § 3125(b); two counts of aggravated indecent assault, in violation of 18 Pa.C.S.A. § 3125(a)(7); incest, in violation of 18 Pa.C.S.A. § 4302; two counts of indecent assault, in violation of 18 Pa.C.S.A. § 3126(a)(7); corruption of minors, in violation of 18 Pa.C.S.A. § 6301(a)(1)(ii); and endangering welfare of children, in violation of 18 Pa.C.S.A. § 4304(a)(1).

Following pre-trial motions, hearings and Orders, Defendant entered into an open guilty plea on January 19, 2017. At the guilty plea hearing, the facts in support of the guilty plea were set forth as follows:

MS. KING: Your Honor, I'll start with information docketed to 2010 of 2016, and his involves the victim A.H. Between January, 2014 and April, 2016 the defendant sexually assaulted A.H. '. She's a child less than 13 years of age

A.H. was between the ages of five and eight when the assaults occurred. The defendant had dated A.H.'s mother and after they broke up he continued to watch A.H. on weekends. On multiple occasions, Your Honor, the defendant engaged in deviate sexual intercourse in that the defendant put his penis in A.H.'s

2

mouth and also licked her vagina and anus with his fingers and a Q-tip looking for pinworms.

...

On multiple occasions the defendant touched A.H.'s vagina and buttocks with his hands. The defendant ejaculated on the floor, bed or on to A.H. A.H. was told by the defendant that this was called baby juice. The defendant showed pornographic videos of adult women and men engaged in sexual acts to A.H., as well as to another victim S.G. who is docketed on information 2011 of 2016. The videos depicted men ejaculating on to the faces of women.

The defendant is over 18. The victim A.H. is under 18, and these actions were a course of conduct that would corrupt or tend to corrupt the morals of A.H. During the times that the defendant committed these acts the defendant knowingly endangered the welfare of A.H. by violating a duty of care, protection or support.

The victim, A.H., told Detective Davis from the Chester County Detectives that the defendant, who she called Crispy liked her best because she was compliant and did what he told her to do.

On May 5th, 2016 the defendant was interviewed by Detective Davis and Sergeant Cusick from Caln Township. The defendant described A.H. as his, quote, "go-to-child", end quote because she was compliant and did what she was told. The defendant stated A.H. was the most sexual of the children.

During that time the defendant would sleep naked with A.H., and he admitted on multiple occasions A.H. sucked on his penis. The defendant admitted that he ejaculated when she did this. He further related he ejaculated on A.H. and that he called his semen baby juice.

The defendant stated that on at least three occasions he would, quote, "hump", end quote, A.H. by placing his penis through her thighs and butt crack from a position behind A.H. while she was lying in the bed sideways.

When the defendant placed his penis between her legs, the tip of his penis protruded out the front of her body. He would then rub his penis against her bare thighs until he, quote, "blew a huge load", end quote.

The defendant admitted that A.H. had sat on his face while she was sleeping. The defendant told Detective Davis and Sergeant Cusick that he would touch A.H.'s vagina and used a Q-tip in her vagina and anus. This was not done, Your Honor, for medical purposes. Rather, it was an excuse to have the girls acquiesce and allow him to touch her vagina and anus.

Defendant said that he told A.H. that when he put his finger in her vagina that this is digital penetration or fingering, and he

3

wanted her to know what it felt like and that he moved his finger around her vagina, quote, "pretty violently". He described A.H.'s vagina as "a tiny little seal", end quote.

He said he knew A.H. viewed pornography and he related he began assaulting A.H. when she was in kindergarten.

That's for information docketed to 2010 of 2016.

Do you want me to go to 2011 of 2016?

THE COURT: What were the ages that A.H. was assaulted? That's not in this.

MS. KING: A.H. was between the ages of five and eight.

THE COURT: Okay. The next one on here is 2011 of 2016, but you can go forward with whichever one you want.

MS. KING: Your Honor, I'll proceed with docketed information 2011 of 2016, and this involves the victim S.G.

Between January, 2014 and April, 2016, the defendant sexually assaulted S.G.

She's a child less than 13 years of age.

S.G. was seven to nine years old at the time.

...

S.G. is the defendant's biological daughter. S.G. and her sister B.G. who is a victim docketed on information 2016 of 2016 would stay with the defendant on weekends pursuant to a custody arrangement.

On at least five occasions the defendant would put his penis between S.G.'s legs and rock back and forth while she was in bed with the defendant at his home. He had a bedroom in the basement of his parents' house.

The defendant showed S.G. and also previously mentioned victim, A.H., docketed at information 2010 of 2016, pornographic videos of adult women and men engaged in sexual acts on at least five occasions. The videos depicted men ejaculating on to the faces of women.

The defendant is over 18. The victim S.G. is under 18. And these actions were a course of conduct and corrupted or tended to corrupt the morals of S.G.

During the times that he committed these acts, the defendant knowingly endangered the welfare of S.G. by violating a duty of care, protection or support.

On May 5, 2016, the defendant told Sergeant Cusick and Detective Davis of the Chester County Detectives he slept naked in his bed with S.G. and that his erect penis would come out of his boxers. The defendant stated he would place his penis between S.G.'s thighs while lying behind her in bed. The top of his penis would protrude between her legs. He admitted he would grind back and forth moving his penis between her legs. He admitted to

4

ejaculating when he did those things, describing it as blowing a huge load. He stated that he knew S.G. had viewed pornography.

Going forward to information docketed at 2016 of 2016, this involves the victim B.G. Between January, 2014 to April, 2016 the defendant sexually assaulted B.G.

She's a child less than 13 years of age.

B.G. is the youngest of the victims. She is also the defendant's biological daughter who at the time was between the ages of five and six when she was sexually assaulted by the defendant. On at least one occasion the defendant engaged in deviate sexual intercourse when he put his penis into B.G.'s mouth.

Your Honor, sexual intercourse includes intercourse by mouth or by anus, and the defendant in putting his penis in B.G.'s mouth engaged in incest. On at least four occasions the defendant penetrated her vagina and anus with his fingers under the ruse he was looking for pinworms. He touched her anus and vagina with his fingers on at least two occasions.

The defendant is over 18, the victim, S.G., is under 18 and these actions were a course of conduct and corrupted or tended to corrupt the morals of B.G. I said S.G. earlier, I'm sorry, Your Honor. It should have been B.G.

During the times he committed these acts, the defendant knowingly endangered her welfare by violating a duty of care, protection or support.

During the defendant's interview with Detective Davis and Sergeant Cusick on May 5, 2016, the defendant admitted that he woke up and that his hand was down B.G.'s underpants. He stated it was, quote, "on her clit moving around" and he described her, quote, "clit was being large like her mother's." He admitted that he did not take his hand out of her underwear for two minutes.

Additionally, defendant admitted to waking up to B.G. sucking on the head of his penis. He stated he was fully aroused and his penis was erect. He stated that on another occasion he was sitting on a chair and his penis came out of his boxers and was pressed up against B.G.'s vaginal area. He told Detective Davis and Sergeant Cusick that he got a quote semi chummy, referring to an erection, and B.G. was grinding back and forth.

He described B.G. as being a sexual child and that B.G. would grab his penis while showering.

He admitted his penis had touched her buttocks. He stated that B.G. tried to get the defendant to put his penis in her vagina a couple of times. He also admitted that he woke up humping B.G.

(N.T., 1/19/17, pgs. 9-13 and 14-18).

5

Thereafter, the following exchange took place between the court and Defendant:

THE COURT: ... Did you hear the facts recited on the record by Miss King, the Assistant D.A.?

THE DEFENDANT: Yes, Your Honor.

THE COURT: And did you see the facts as typed out and attached to the plea agreement that's before me?

THE DEFENDANT: Yes, Your Honor.

THE COURT: And do you agree with everything that Miss King said and everything that's written in the written facts, is that what you did?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Have you had enough time to discuss your case, the facts, the law, and any possible defenses with your lawyer?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Are you satisfied with her advice and representation?

THE DEFENDANT: Yes.

(N.T., 1/19/17, pgs. 24-25).

In addition to the facts set forth and agreed to by Defendant on the record in support of the plea, the following facts were set forth in the Guilty Plea Colloquy form that Defendant executed:

AH 2010-016

Between January 2014-April 2016, the defendant, sexually assaulted AH             a child less than 13 years of age.

The Defendant dated AH's mother and after they broke up, the Defendant continued to watch AH and her younger sister, in that (AH and her sister) they would spend the night or weekends with the Defendant. On at least 7 occasions the Defendant engaged in deviate sexual intercourse, in that the Defendant put his penis in AH's mouth and licked her vagina. On at least 7 occasions, the Defendant penetrated AH's vagina and anus with his fingers (and q-tip) under the pretext that he was looking for pinworms. On at least 7 occasions the defendant touched AH's vagina, buttocks with his hands. The Defendant ejaculated on the floor, bed or on AH and AH was told by the Defendant that it was babyjuice. The Defendant also showed pornographic videos of adult women and men engaged in sexual

6

acts to AH and SG (another victim who was 10 years of age – docketed on information 2011-2016). The videos depicted men ejaculating onto the faces of women. The Defendant is over 18, the victim AH is under 18 and these actions were a course of conduct and corrupted or tended the corrupt the morals of AH. During the times that he committed these acts, the defendant knowingly endangered the welfare of AH by violating a duty of care, protection, or support. AH told Defective Jerry Davis that the defendant, whom she called Crispy, liked her best because she was compliant and did what the defendant told her to do.

On May 5, 2016, the Defendant was interviewed by Det Jerry Davis and Sgt Cusick. The Defendant described AH as his "go to child" because she was compliant and did what she was told. During that time, the Defendant would sleep naked with AH. The Defendant admitted that on multiple occasions, AH sucked on his penis. He further related that he ejaculated on AH and called his semen, "baby juice." The Defendant stated that on at least three occasions he would "hump" AH by placing his naked penis through her thighs and butt crack from a position behind AH while she was lying in the bed sideways. When Guiseppe placed his penis between her legs, the tip of his penis protruded out the front of her body. He would then rub his penis against her bare thighs until he "blew a huge load." The defendant admitted that AH sat on his face while he was sleeping. The defendant told Det Davis and Sgt Cusick that he would touch AH's vagina and used a qtip to look for pinworms in her vagina and anus. This was not done for medical purposes, but rather provided an excuse to have the girls acquiesce and allow him to touch her vagina and anus. The defendant said that he told AH that when he put his finger in her vagina, that is what digital penetration (fingering) felt like and that he moved his finger around her "pretty violently" when it was inside AH's vagina. He described AH's vaginas as a "tiny, little seal." He said he knew AH viewed pornography. He related that he began assaulting AH when she was in kindergarten.

SG 2011-2016 – Between dates of January 2014 – April 2016

SG                    SG who was 9-10 years old at the time of the sexual assaults is the Defendant's biological daughter. SG and her sister BG (docketed on information 2016-2016) would stay with the Defendant on weekends pursuant to a custody arrangement. Between January 2014 – April 2016, on at least 5 occasions, the defendant would put his penis between SG's legs and rock back and forth while she was in the bed with the Defendant at his home

7

(a bedroom in the basement of his parents' house .
                                                    . The defendant
showed SG and previously mentioned AH (docketed at information
2010-2016), pornographic videos of adult women and men
engaged in sexual acts on at least 5 occasions. The videos
depicted men ejaculating onto the faces of women. The Defendant
is over 18, the victim SG is under 18 and these actions were a
course of conduct and corrupted or tended the corrupt the morals
of SG. During the times that he committed these acts, the
defendant knowingly endangered the welfare of SG by violating a
duty of care, protection, or support.

On May 5, 2016, Defendant told Sgt. Cusick and Det Davis, CCD,
that he slept naked in his bed with SG and that his erect penis
would come out of his boxers. He stated that he would place his
penis between SG's thighs while lying behind her in bed. The top
of his penis would protrude between her legs. He admitted he
would grind back and forth, moving his penis between her legs. He
admitted to ejaculating when he did those things. He stated that he
knew SG had viewed pornography.

BG – 2016-2016. Between January 2014 – April 2016.


BG is the youngest of the three victims and is also the Defendant's
biological daughter who was between the ages of 6-8 when she
was sexually assaulted by the Defendant. On at least one
occasion the Defendant engaged in deviate sexual intercourse
when he put his penis into BG's mouth. Sexual intercourse
includes intercourse by mouth or by anus – and the defendant in
putting his penis in BG's mouth engaged in incest. On at least 4
occasions, the Defendant penetrated her vagina and anus with his
fingers under the ruse that he was looking for pinworms.
Defendant touched the victim's anus and vagina with his fingers on
at least two occasions. The Defendant is over 18, the victim [BG]
is under 18 and these actions were a course of conduct and
corrupted or tended the corrupt the morals of [BG]. During the
times that he committed these acts, the defendant knowingly
endangered the welfare of [BG] by violating a duty of care,
protection, or support.

During the Defendant's interview with Det Davis and Sgt Cusick,
the defendant admitted that he woke up and his hand was down
BG's underpants, "on her clit" moving around and he described her
"clit as being large like her mothers. He admitted that he did not

8

take his hand out of her underwear for 2 minutes. Additionally, Defendant admitted to waking up to BG sucking on the head of his penis, that he was fully aroused and his penis was erect. He stated that he on another occasion he was sitting on a chair and his penis came out of his boxers, and was pressed up against BG's vaginal area. He stated that he got a "semi chummy" and BG was grinding back and forth. He described BG as sexual and would grab his penis while he was showering. He admitted that his penis touched BG's buttocks. He stated that BG tried to get the defendant to put his penis in her vagina a couple of times. He admitted that he woke up humping her.

On January 26, 2017, Notice of Sentencing was filed, scheduling sentencing for April 10, 2017. On March 22, 2017, an Order was entered upon agreement of counsel to reschedule sentencing due to a conflict. On March 29, 2017, a second Notice of Sentencing was filed scheduling sentencing for May 8, 2017. Prior to that sentencing date, Defendant filed a motion to Withdraw Guilty Plea and Appoint Conflict Counsel on April 28, 2017. On May 8, 2017, the Commonwealth filed an Answer to the Motion. On May 8, 2017, an Order was entered appointing Alexander Silow, Esquire, to represent Defendant. A hearing on Defendant's Motion to Withdraw Guilty Plea was held on June 20, 2017. On June 28, 2017, the Commonwealth filed a Supplemental Response to Defendant's Motion. On August 7, 2017, an Order was entered denying Defendant's request to withdraw his plea and a pre-sentence investigation was ordered.

Defendant was sentenced on December 6, 2017 and he filed a Post Sentence Motion on December 8, 2017. An Order was entered on December 15, 2017 directing the parties to file briefs addressing the issues set forth in Defendant's motion. Defendant's Memorandum of Law was filed January 30, 2018 and the Commonwealth's Response was filed February 14, 2018. On March 26, 2018 an Order was entered denying Defendant's Post Sentence Motion requests.

9

On April 26, 2018, Defendant filed a timely appeal. On May 7, 2018 an Order was entered directing defense counsel to file a Concise Statement of Errors Complained of on Appeal within twenty-one (21) days. Defendant's statement was filed on May 15, 2018.

Defendant's only argument on appeal is that "[t]he Trial Court erred by denying Defendant's motion to withdraw his guilty plea prior to being sentenced." We note that Defendant requested to withdraw his guilty plea both prior to sentencing and after sentencing in his post-sentence motion, filed on December 8, 2017. We shall examine defendant's request to withdraw his plea under the more liberal standards set forth for pre-sentence requests. Appellant review of a trial court's ruling on a pre-sentence motion to withdraw a guilty plea is under an abuse of discretion standard. Commonwealth v. Islas, 156 A.3d 1185, 1187 (Pa.Super. 2017), citing Commonwealth v. Elia, 83 A.3d 254, 261 (Pa.Super. 2013).

"Pennsylvania Rule of Criminal Procedure 591(A) provides: 'At any time before the imposition of sentence, the court may, in its discretion, permit, upon motion of the defendant, or direct, sua sponte, the withdrawal of a plea of guilty or nolo contendere and the substitution of a plea of not guilty.'" Islas, 156 A.3d at 1187, quoting Pa.R.Crim.P. 591(A). "The official comment to Rule 591 provides: 'After the attorney for the Commonwealth has had an opportunity to respond, a request to withdraw a plea made before sentencing should be liberally allowed.'" Id. "Similarly, in Commonwealth v. Forbes, the Pennsylvania Supreme Court concluded: 'Although there is no absolute right to withdraw a guilty plea, properly received by the trial court, it is clear that a request made before sentencing ... should be liberally allowed.'" Islas, 156 A.3d at 1187-1188, quoting Forbes, 299 A.2d 268, 271 (Pa. 1973).

10

"'In determining whether to grant a pre-sentence motion for withdrawal of a guilty plea, the test to be applied by the trial courts is fairness and justice. If the trial court finds 'any fair and just reason,' withdrawal of the plea before sentence should be freely permitted, unless the prosecution has been "substantially prejudiced."' Islas, 156 A.3d at 1188, quoting Forbes, 299 A.2d at 271. (internal citations and some internal quotations omitted).

"In Commonwealth v. Carrasquillo, ... the Pennsylvania Supreme Court recently provided further guidance on the proper exercise of discretion in the context of pre-sentence requests to withdraw guilty pleas. While the Court reaffirmed the Forbes liberal-allowance standard, it also observed that its own application of that standard had 'lent the false impression that this Court had required acceptance of a bare assertion of innocence as a fair-and-just reason' to withdraw a guilty plea." Islas, 156 A.3d at 1188, quoting Carrasquillo 115 A.3d 1284, 1292 (Pa. 2015). "'In other words, we acknowledge the legitimate perception of a per se rule arising from this Court's decisions.'" Id. The Carrasquillo Court acknowledged that "'[w]hile our Court shared this misimpression, ... we also observed that this per se approach was 'apparently an extremely unpopular rule with prosecutors and trial courts.'" Islas, 156 A.3d at 1188-1189, quoting Commonwealth v. Kirsch, 930 A.2d 1282, 1285 (Pa.Super. 2007).

"Rejecting the per se approach, our Supreme Court in Carrasquillo held that 'a

11

bare assertion of innocence is not, in and of itself, a sufficient reason' to grant a defendant's motion to withdraw a guilty plea." Islas, 156 A.3d at 1189, quoting Carrasquillo 115 A.3d at 1285. The Carrasquillo Court "further stated that 'a mere, bare, or non-colorable assertion of innocence is insufficient, in and of itself, to support withdrawal of a plea.'" Islas, 156 A.3d at 1189, quoting Carrasquillo 115 A.3d at 1290, n.6. Replacing the bright-line rule, the Carrasquillo Court "instructed that 'a defendant's innocence claim must be at least plausible to demonstrate, in and of itself, a fair and just reason for presentence withdrawal of a plea. More broadly, the proper inquiry on consideration of such a withdrawal motion is whether the accused has made some colorable demonstration, under the circumstances, such that permitting withdrawal of the plea would promote fairness and justice.'" Islas, 156 A.3d at 1189, quoting Carrasquillo 115 A.3d at 1292.

The Carrasquillo Court provided several guideposts that bear on the proper exercise of discretion by trial courts when addressing requests to withdraw a guilty plea. Islas, 156 A.3d at 1190. "First, the Court squarely rejected a per se approach in which any presentence motion to withdraw a guilty plea based on a claim of innocence must be granted." Id. "Second, nothing in Carrasquillo suggests that the Court intended the pendulum to swing fully in the other direction—from automatic grants to automatic denials of pre-sentence motions to withdraw. Indeed, the Court expressly reaffirmed the liberal-allowance language in Forbes, which continues to stand in sharp contrast to the 'manifest injustice' standard for post-sentence motions to withdraw." Id. "Third, the Court directed trial courts to distinguish between 'mere, bare, or non-colorable' assertions of innocence on the one hand and those that are 'at least plausible' on the other." Id. "Fourth, as trial

12

courts undertake the task of making that distinction, both the timing and the nature of the innocence claim, along with the relationship of that claim to the strength of the government's evidence, are relevant." Id.

We now turn to the facts of the cases that have applied these standards for guidance. In Carrasquillo "our Supreme Court ruled that the defendant had not offered a plausible innocence claim given that it was rather bizarre—a 'devil made me to it' claim of innocence—and since the innocence claim was offered just prior to sentencing" the denial of the request to withdraw the guilty plea was upheld. Commonwealth v. Baez, 169 A.3d 35, 39 (Pa.Super. 2017), citing Carrasquillo, 115 A.3d at 1292.

In a companion case to Carrasquillo, the Pennsylvania Supreme Court in Commonwealth v. Hvizda, "upheld the trial court's refusal to permit the defendant to withdraw his guilty plea because his innocence assertion was implausible as it was unsupported and rebutted by the Commonwealth's proof." Baez, 169 A.3d at 40, citing Hvizda, 116 A.3d 1103 (Pa. 2015). "In Hvizda, the defendant entered a guilty plea to first degree murder in connection with the stabbing death of his estranged spouse. Prior to imposition of his sentence, he asked to withdraw the plea claiming that he was innocent. The trial court conducted a hearing on the request to withdraw, where the defendant again asserted that he was innocent but failed to proffer any support for that claim. On the other hand, the Commonwealth produced recorded telephone conversations that the defendant made from jail; in the tapes, the defendant admitted that he killed his wife and indicated that he wanted to go to trial to tell his side of the story." Id.

The Pennsylvania Superior Court in Commonwealth v. Johnson-Daniels noted that in Commonwealth v. Blango, it applied Carrasquillo and "concluded that the trial court had

13

not abused its discretion in declining to permit the defendant to withdraw his guilty plea. We noted that, in light of the defendant's trial testimony against his co-defendants admitting his role in the offense and the timing of his motion, which was made immediately after learning of the Commonwealth's sentencing recommendation, the defendant's assertion of innocence was 'implausible' and 'instead was an attempt to manipulate the system.'" Commonwealth v. Johnson-Daniels, 167 A.3d 17, 24 (Pa.Super. 2017), quoting Blango, 150 A.3d 45, 48 and 52 (Pa.Super. 2016).

"[More] recently, in Islas, the Superior Court applied Carrasquillo and concluded that the trial court had erred in denying the defendant's pre-sentence motion to withdraw his guilty plea. The court concluded that, unlike the defendants in Carrasquillo and Blango, Islas' assertion of innocence was 'not mere, bare, or non-colorable, but instead was at least plausible.'" Johnson-Daniels, 167 A.3d at 24, citing Islas, 156 A.3d at 1189. The Islas Court noted "that Islas had entered his plea three days before trial was set to begin and before a jury had been selected. He had moved to withdraw his plea over one month after its entry, when new counsel entered his appearance, and almost two months before sentencing." Id. The court "also observed that Islas had maintained his innocence from the beginning, even though we noted further that a conclusion that a claim of innocence is likely or unlikely to succeed at trial is 'irrelevant' to the consideration of whether the trial court properly denied the motion to withdraw." Id. The Islas Court further determined that the defendant's "assertions constituted valid defenses against the charges leveled by the victim, ... [and] reversed the trial court's denial of Islas' pre-sentence motion to withdraw his guilty plea." Baez, 169 A.3d at 40, citing Islas, 156 A.3d at 1191.

14

In Commonwealth v. Johnson-Daniels the Superior Court applied these standards and concluded that the trial court did not abuse its discretion in refusing the withdrawal of the guilty plea. 167 A.3d at 25. The facts in that case were that "despite the case being initially listed in 2014, Appellant entered his guilty plea on the day trial was set to begin in December 2015. Seven weeks after the entry of the guilty plea, on the day of sentencing, the Commonwealth made a passionate argument regarding Appellant's crimes before informing the court the sentence it was recommending. It was only after hearing the recommended sentence that Appellant's counsel requested the withdrawal of the plea." Id. at 24. The Johnson-Daniels Court also determined that the defendant's assertion of innocence was lacking in plausibility, which was another factor in upholding the denial of the request to withdraw the plea. Id. at 25.

In Commonwealth v. Baez, the Superior Court applied these standards and concluded that the trial court did not abuse its discretion in refusing the withdrawal of the guilty plea. In Baez, the defendant "offered a bald claim that he was innocent that was unaccompanied by assertions that he had defenses to the charges. The guilty plea colloquy refuted his secondary position that he pled guilty because the trial court told him that it would impose a sentence of sixty-five years in jail if the jury convicted him. On the other hand, the record establishes that the victim testified that Appellant penetrated her vagina with his penis and fingers and that he placed his mouth on her vagina." 169 A.3d at 40.

Turning to the case at hand, in addition to alleging his innocence, Defendant set forth the following as the bases to withdraw his plea. He alleged counsel was ineffective for having him enter the plea because he did not view the entire video of his police

15

interview and he did not get a transcript of the video. Defendant also alleged that the video of his police interview was altered/mechanically manipulated and he wanted defense counsel to hire an expert witness to examine the video.

A hearing was held on June 20, 2017 at which Defendant's prior counsel, Sergeant Christine Cusick and Detective Gerald Davis all testified credibly regarding these allegations. We shall first address the issue regarding Defendant's allegation that his police interview was altered or mechanically manipulated. Sergeant Christine Cusick and Detective Gerald Davis interviewed Defendant on May 5, 2016 regarding the allegations of sexual assaults on the three minor victims. (N.T., 6/20/17, p. 13). The interview was audio and video-recorded at the Caln Police Department. (N.T., 6/20/17, pgs. 13-14).

Sergeant Cusick testified that the "interview room in the Caln Police Department [is] set up so that we can automatically record audio and video, so once we activate that switch, it does record to a server. And we go into the server and we can retrieve that information and put it to a disk." (N.T., 6/20/17, p. 14). The system records about an hour at a time. (N.T., 6/20/17, p. 15). This procedure was done in this case and the audio/video recording of this interview consisted of five disks that were entered into evidence as Exhibit CW1. (N.T., 6/20/17, pgs. 14-15).

When questioned as to whether she did anything to manipulate the disks in anyway, Sergeant Cusick responded, "Not at all. These are DVDs, so they are not rewritable as far as I know. And I wouldn't know how to do that anyway." (N.T., 6/20/17, pgs. 16-17). Sergeant Cusick also testified that she reviewed the video interview of Defendant and it accurately reflected the interview that took place on May 5, 2016. (N.T.,

16

6/20/17, p. 17).

Detective Davis testified that the interview of Defendant on May 5, 2016 lasted approximately four and a half hours. (N.T., 6/20/17, p. 48). He reviewed all five disks of the video of Defendant's interview and it was identical to the actual interview that took place on May 5, 2016. (N.T., 6/20/17, pgs. 48-49). Detective Davis testified that he did not manipulate the disks in any way, nor was there "editing in any way, shape or form." (N.T., 6/20/17, p. 49). When asked "Was there any material that could have been deleted from the disk?," Detective Davis responded, "No." Id.

Prior defense counsel Kelly Jurs was also questioned regarding the disks of the interview as follows:

Q     When you had the opportunity to review the disks, all five disks, I believe, of the defendant's May 5 statement to the police in this case, did you notice anything unusual with any of the disks, any problems with running the disk or observing something unusual indicating some sort of a manipulation?
A     No, nothing like that at all.
Q     Did anything look like it was edited, in your personal view?
A     No. Nothing – nothing indicated that, or there was nothing that called – that brought my attention to that kind of issue, the continuity of the language flowed. There were not any breaks. The conversations all made sense within the context, so I had no reason to believe that there was any kind of editing that would have occurred.

(N.T., 6/20/17, pgs. 24-25).

On cross-examination, the following exchange took place:

Q     Did he point out at any time prior to taking the guilty plea that he believed, excuse me, that his statement to the officers were altered in any way?
A     I don't believe so. When we watched the videos – no. I mean, he would stop the video to ask questions about what was being said, and try to explain what was being said. But the first time that he brought this up, to my recollection, was after he entered into the guilty plea as far as the tampering was concerned.

17

Q     Did he point out to you at any time where he thought the video was altered?
A     No.
Q     Did he ask for you to send the video out to an outside specialist to determine whether or not the video had been altered?
A     He did.
Q     And did you do that?
A     No.
Q     Why not?
A     He made that request post-plea. And after conferring with my supervisor and evaluating whether I thought there was merit to that, or not, we determined that there wasn't, and it would, basically, be a waste of time and money to do that.
Q     Can you please elaborate a little more on that, on your discussions and decisions?
A     Sure.

I – when he had brought this up, and I apologize I can't recall if Mr. Schenker was there at one of these meetings where he mentioned that, he may have been, but I went to Mr. Schenker and said, Mr. Guiseppe has raised this issue, I don't think it has any merit. Is it something that we should send out to have looked at? And he said, no.

THE COURT: For the record, who's Mr. Schenker?

THE WITNESS: Mr. Schenker is the First Assistant Public Defender, and my direct supervisor.

BY MR. SILOW:
Q     When he pointed out parts of the video that he thought were altered, did you view those parts with him?
A     I don't recall him pointing out any parts of the video that were altered.

(N.T., 6/20/17, pgs. 34-35).

This court independently reviewed all four hours and thirty-three minutes of the video interview of Defendant. (Exhibit CW1). Throughout this lengthy interview, slight pauses occur on thirteen occasions at the following time counts: Disk one: 11:42:26; Disk two: 12:00:32 and 12:18:38; Disk three: 13:12:57, 13:31:04 and 13:49:10; Disk four: 14:07:17, 14:25:24 and 14:43:30; and Disk five: 15:01:37, 15:01:44, 15:19:44 and 15:37:50.

18

However, the time counter on the disks never skips any seconds and the continuity of the language continues to flow after each slight pause. It is abundantly clear to this court that these disks were not manipulated during or after the interview and the slight pauses were due to the technology used to record and or copy the interview to the disks. There was nothing deleted from or added to the interview. Based on the totality of the evidence presented to the court, it is found that Defendant's allegation that the video was altered is without merit.

It is also found that prior defense counsel was not ineffective for failing to hire an expert to examine the disks of the video interview when it is clear that they were not altered. It would have been a waste of resources of both time and money to comply with Defendant's unreasonable request.

We now turn to Defendant's allegation that prior counsel was ineffective for having him enter the plea because he did not view the entire video of his police interview and he did not get a transcript of the video. Prior defense counsel acknowledged that after Defendant entered the guilty plea, he indicated that he had concerns about not having viewed the entire video of the interview. (N.T., 6/20/17, pgs. 26 and 33).

When Ms. Jurs was questioned as to why Defendant was not shown the entire video from start to finish, the following exchange took place:

Q    And did you share with the defendant his statements that was testified to earlier, the statement of May 5, 2016, with Detective Jerry Davis, as well as Sergeant Cusick?
A    I did review portions of it with him, yes.
Q    And when you – you stated you reviewed portions of it, what kind of portions – what portions did you review?
A    The portions that I reviewed with Mr. Guiseppe were the ones that I thought pertained most directly to the specific incidents that were alleged and the criminal complaint in the criminal information.

19

The statements that he gave to the police officer and the statements that he went through during the polygraph exam were quite lengthy. I did review all of those myself, and then reviewed the portions that I thought were appropriate – not appropriate, but most critical to what we were dealing with, and addressing as far as the charges were concerned, specifically, and what evidence the Commonwealth could present at trial.

Q      When you reviewed the defendant's statement on May 5, 2016, the entire statement was not just about the actual allegations, there was other superfluous types of information contained in there?

A      Correct. There was other information concerning his relationships with ex-girlfriend, family issues, family history, a number of different things which may have collaterally been relevant, but I was trying to, basically, target what was going to be, in effect, what I judge, most damaging and most problematic to review with him.

(N.T., 6/20/17, pgs. 23-24).

Having independently reviewed the entire video of the interview, this court confirms that counsel's assessment of the interview was correct in that there were discussions throughout the interview about topics that would not have been applicable to a discussion between Defendant and counsel about the charges and possible defenses.

It must be remembered that this video was an interview of Defendant himself. It was not an interview of a third party witness to which Defendant would not know what was said during the interview. Defendant fully participated during the interview and has firsthand knowledge about what he told the law enforcement officers. Defendant's allegation that counsel was ineffective for failing to show him the entire interview and that he was somehow prejudiced by this is without merit.

Defendant's allegation that he should have been provided a copy of a transcript of the interview is also without merit. This four and a half hour interview was not

20

transcribed. Ms. Jurs testified that "generally speaking, our policy is not to have things transcribed unless we're confident that something is going to go to trial. And then, generally speaking, we get those transcripts from the Commonwealth and review them with the clients beforehand." (N.T., 6/20/17, p. 33). Counsel cannot be ineffective for failing to give Defendant a document that does not exist. In addition, Defendant participated in the interview and had firsthand knowledge of what was was said throughout. Therefore, this allegation is found to be without merit.

We now turn to Defendant's allegation of innocence. During his requests to withdraw his guilty plea Defendant alleged that he was innocent of the charges but failed to proffer any support for that claim. His innocence assertion is implausible as it is rebutted by the Commonwealth's proof. Defendant had confessed to the crimes and gave detailed accountings of what transpired between him and the three minor victims. Many of the details he gave to the officers were confirmed in the independent interviews of the victims.

Detective Davis testified about some of these specific acts to which Defendant confessed during the interview. Regarding six year old victim B.G., Defendant confessed to waking up with his hand down B.G.'s underpants "on her clit moving around." (N.T., 6/20/17, p. 50). Defendant described B.G.'s clit as being "large like her mother's." Id. Defendant told Detective Davis that his hand was in B.G.'s underpants for approximately two minutes before her removed it. (N.T., 6/20/17, p. 50).

In the interview, Defendant had "admitted to waking up to B.G. sucking on [the] head of his penis." (N.T., 6/20/17, p. 51). Defendant confessed that he was fully aroused and his penis was erect. Id. Defendant also admitted to another sexual

21

encounter with B.G. when he was sitting in a blue chair. He "described that his penis had come out of his boxers and that the victim was on his lap and began to grind. And he became semi-erect because of that" using the term chubby or chummy to describe his penis. Id. Also in the interview, Defendant confessed to waking up humping B.G. and told the Detective that B.G. tried to get Defendant to put his penis in her vagina "several times." (N.T., 6/20/17, p. 52).

Regarding nine year old victim S.G., Defendant admitted that he would sleep naked with her and would wake from erotic dreams. (N.T., 6/20/17, p. 56). Defendant confessed that his penis would come out of his boxers and he would rub his erect penis between S.G.'s thighs, humping her, until her ejaculated. Id. Defendant referred to that several times in the interview as "blowing a huge load." (N.T., 6/20/17, p. 57). Defendant also admitted to showing pornography to S.G. Id.

Regarding ten year old victim A.H., Defendant admitted in the interview that A.H. had performed oral sex on him, there was digital penetration, he showed her pornography and that he ejaculated with her. (N.T., 6/20/17, p. 53). In his interview and the interview of the victim A.H., both individuals used the term "go-to-girl" to describe A.H. and that Defendant's ejaculation was called baby juice. (N.T., 6/20/17, pgs. 53-54).

Defendant confessed to rubbing his penis against A.H's bare thighs and would describe his "ejaculation as blowing a huge load on the victim." (N.T., 6/20/17, p. 54). Defendant also admitted to sleeping naked with A.H. on multiple occasions. Id. Defendant told Detective Davis that he would use his eyes, fingers and Q-tips to look for pinworms in the victims' anuses and vaginal areas. (N.T., 6/20/17, pgs. 54-55).

22

In describing the aggravated indecent assault he performed on A.H., Defendant explained "that A.H. wanted to know what it felt like to be digitally penetrated, using the slang word of fingered, and he said that he demonstrated that for A.H., and that he did so violently." (N.T., 6/20/17, p. 55). Defendant described A.H.'s vagina as a "tiny little seal." Id.

It is also extremely compelling to learn that at the time of the interview, the law enforcement officers did not know that A.H. was one of Defendant's victims. (N.T., 6/20/17, p. 56). He supplied all of the information to them about acts he performed on A.H., which were later confirmed by the victim herself. Id. Defendant told the law enforcement officers that "he felt her shouldn't get in trouble for it since he provided it to us." Id.

After the May 5, 2016 interview, Defendant was allowed to leave the police station. (N.T., 6/20/17, p. 57). When he was eventually taken into custody, he was in possession of a cell phone that was examined and found to contain discussions about the children. Id. Defendant had reached out to a relative of A.H., either her mother or grandfather, and used language very similar to what he used in the interview to describe what he had done with the child, specifically, "blowing a huge load on the victim." (N.T., 6/20/17, pgs. 57-58).

These are just some examples of the evidence the Commonwealth has to refute Defendant's claim of innocence. Defendant's confession and his statements describing the acts, which were corroborated by the victims, lead this Court to conclude that Defendant's innocence assertion is implausible.

23

Based on all of the reasons set forth above, it was proper for this Court to deny Defendant's request to withdraw his guilty plea and his appeal should be denied and dismissed.

BY THE COURT:

_Phyllis Streitel_
PHYLLIS R. STREITEL, S.J.

DATE: 6/24/18

24